UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL BUDRAM,　　　　　　　　　　　　　　File No.

　　Plaintiff,　　　　　　　　　　　　　　　　　　Hon.

v.

KALAMAZOO COUNTY, THOMAS
WHITNER and CYNTHIA GILL,

　　Defendants.

# COMPLAINT AND JURY DEMAND

Plaintiff Michael Budram, by his attorneys, Pinsky Smith, PC, represents:

### Jurisdiction, Venue, and Parties

1. This is an action requesting the Court to remedy violations of the Family Medical Leave Act ("FMLA"), 29 USC §2601, *et. seq.* and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 *et seq.*

2. The Court has jurisdiction over this action pursuant to Section 107(a)(2) of the FMLA 29 U.S.C. § 2617(a)(2), and pursuant to 28 U.S.C. §§ 1331 and 1367.

3. Plaintiff Michael Budram is a resident of Kalamazoo County, Michigan, in the Western District of Michigan, Southern Division.

4. Defendant Kalamazoo County ("the County") is a local unit of government organized pursuant to the law of the state of Michigan; a state actor; and an employer of Plaintiff under state law.  The County conducts its business throughout Kalamazoo County, which is located in the Western District of Michigan, Southern Division.

5. Defendant County was and is a public body as set forth in MCL 15.361(d). Defendant County is subject to the requirements of the FMLA.

6. Defendant Thomas Whitener is the County Treasurer of Kalamazoo County and has been in this position for all relevant time periods to this case.

7. Cynthia Gill was the Chief Deputy Treasurer of Kalamazoo County during all relevant time periods to this case.

8. Venue is proper within this judicial district under 28 USC §1391(b).

## Relevant Facts

9. Plaintiff incorporates by reference the allegations of all prior paragraphs, as if they were restated herein.

10. Plaintiff Budram was hired by Kalamazoo County and Thomas Whitener as the Deputy Treasurer on June 28, 2021.  Defendant Whitener and Cynthia Gill, the Chief Deputy Treasurer informed him that his main responsibilities would be managing the four people up front and managing the foreclosure process, being the liaison with the County Clerk and Register of Deeds.

11. Plaintiff Budram had and has a chronic health condition called Idiopathic Angioedema (IA). IA attacks would come without warning and can be life-threatening.

12. Over the course of Plaintiff's first year, staffing for the offices was low and employee turnover was high. This added significantly to Mr. Budram's (and others') workload.

13. Also, during the years of Plaintiff's employment with Kalamazoo County, there were policies and protocols by which County employees were required to abide regarding the Covid-19 virus. This included testing, quarantining, disclosure of positive status, masking from time-to-time and other practices strictly followed.

14. Defendants Whitener and Ms. Gill were aware that Plaintiff Budram had a chronic medical condition of Idiopathic Angioedema (IA). In August of 2021, Plaintiff required throat surgery that stemmed from a previous IA attack. He needed to take several personal days off work due to the surgery. While Budram was generally able to manage the condition without it affecting his work or needing time off, he had attacks from time to time that required medical care and/or Emergency Room visits. Budram notified his supervisors when this happened.

15. In December of 2021, Plaintiff was informed by Whitener and Gill that Treasury investments had been made incorrectly and the department went into crisis-mode to attempt to rectify the situation. Employees were regularly taken

away from their daily duties and tasks in the front office by Ms. Gill to help her with managing this crisis.

16. Despite the urgency of the situation in the office both Mr. Whitener and Ms. Gill took significant time away from work, and especially toward the end of the year.  It was disruptive to any ability to rectify the broken system and several employees commented on the significant time off Mr. Whitener and Ms. Gill took compared to other employees.

17. In late April 2022, Defendant Whitener attended an unmasked event during a Covid spike and was exposed to Covid.  Whitener still came into the office, even when he became symptomatic and was visibly sick. Later the following day, he received confirmation that there was exposure to Covid at the event and left the office. Whitener tested positive on Monday May 1, and privately informed Budram on May 2.

18. Plaintiff suggested Defendant Whitener close the office due to County policy since all employees had effectively been exposed to Covid. Whitener indicated he did not want to close the office. Hours later Whitener emailed his Covid-positive test results to Plaintiff and Gill. Current County policy required anyone who was exposed to Covid to be away from the office for five days.

19. This was alarming to Budram, especially due to his chronic medical condition, and because of the exposure to other staff. Budram sent an email to the office staff later on May 2 explaining that he had been exposed to Covid and would

be out for the required five days. He was forced to take three personal days to quarantine so as not to endanger his health.

20. Eventually, on Wednesday May 3, Whitener sent an email to the whole office explaining that he had Covid, and explained he didn't close down the office previously citing an unrelated guideline as an excuse which was inapplicable to the situation. Later that same day, another office employee put in her resignation.

21. After Plaintiff challenged the handling of this Covid exposure, Defendants Gill and Whitener began treating Budram very differently, and negatively. Gill refused to speak with the Plaintiff and would only communicate with him through email. Defendant Whitener began avoiding Plaintiff.

22. When Budram returned from his leave, none of the critical tasks that should have been done by someone at the office were done. These were everyday essential tasks which had previously been covered by office staff when necessary.

23. Soon after, Defendant Whitener called Budram into a meeting and told him that Defendant Gill was complaining about his behavior. Budram asked for examples or more specific details, which were not forthcoming. Budram reminded Defendant Whitener that his annual review should be forthcoming, which Whitener agreed was true. Whitener told Budram that he had been doing a good job and that he would perform his review "soon."

24. The situation worsened. Budram was targeted and treated poorly by his supervisors and staff members. He was blamed if anything went wrong, often

publicly, and the friendship he shared with Defendant Whitener disintegrated.[1] While Budram used to receive help to hire and train workers in the office, suddenly, no one would help him.  It became harder and harder to work in that environment and to keep the work environment positive.

25. In August of 2022, Budram attended a public treasurer's conference in Las Vegas along with Whitener and Gill.  While Budram fully utilized the programs at the convention, there were a few unmasked social events that he chose to not attend.  Soon after returning from the convention, Whitener pulled Budram into a meeting and told him that he and Gill were upset that Budram did not seem to attend many conference events.  Budram explained that it was untrue and that he attended nearly all programs offered, except for a few unmasked events.  Budram reminded Whitener that he even talked to them in two of the sessions Whitener claimed he missed.  Defendant Whitener dropped the subject.

26. This accusation from Whitener was very curious. Throughout this same year both Defendants Whitener and Gill were constantly out of the office and employees were coming to Budram on issues that should have gone to his supervisors.  The Assistant Treasurer (in reconciliation), Karen Pittman, stated to Budram that she was finding it difficult to take anytime off at all as the leave calendar was filled with Defendants Whitener's and Gill's requests. Several other employees made comments regarding their significant absences as well.

---

[1] The gentlemen were friends and worked together on Mr. Whitener's campaign prior to Mr. Budram being hired into the County.

27. Plaintiff Budram continued working with employees beyond his responsibility and attempted to help them while keeping up with his duties and responsibilities. The few times Budram needed time off, co-workers that used to cover for him opening and processing mail and other necessary daily tasks like approving journal entries and posting deposits no longer did so. It was maddening when he came back into the office to learn that large checks had been sitting in a pile for several days and no one had paid attention to or processed them.

28. The Financial Department sent emails wondering why deposits weren't posted due to the failure of someone picking up these duties. Upon information and belief, the failure to cover for Budram's absences was intentionally punitive as it had the first time it occurred after the Covid exposure incident and continued thereafter.

29. In September and October of 2022, more crushing resignations were forthcoming from key finance department employees, and Plaintiff Budram's load continued to get heavier and heavier. In the meantime, Defendant Whitener still had not given Budram his annual review that would trigger the raise to which he was entitled especially with the enormous responsibilities and hours he had to take on. This is also despite the County's human resources messaging regarding the importance of County supervisors to complete the reviews.

30. By mid-October, Budram asked to meet with Whitener and he showed him his current daily task list to illustrate the enormous amount of duties he was expected to get done. Plaintiff further explained that Gill was not mentoring him

nor advising him on how to take on certain matters – especially when both Defendants Gill and Whitener had previously indicated that they wanted Budram to become the next Chief Deputy Treasurer. Whitener agreed that the work was far too much for one person and that the three of them should sit down to redistribute the duties. Whitener never followed through.

31. Plaintiff Budram took leave time October 12-14 that had been previously scheduled. A repeat of his previous time off happened: No mail was processed; no deposits were approved or posted; and none of these integral duties were picked up as they should have been.[2]

32. On October 15, Budram had an IA attack that sent him to the emergency room and he informed Defendants Whitener and Gill about it at that time in case the emergency was going to last a while. Ultimately, Budram did not miss any work because of it, and was back in the office working Monday due to the enormous work load he had to cover.

33. Around this same time, Gill began requesting that Budram put receipts into the ERP on his own. Typically, one of the front office staff would be allowed to put in receipts, and then Budram, as the Deputy, would approve them. The two-step process was integral to ethical accounting practices. For him to put them in and approve them, would have been a serious violation of accounting practices, County policy, and Ms. Gill was well-aware of this.

---

[2] This continued for the rest of Budram's employment. This was not a matter of understaffing as when he arrived, they were understaffed. These essential daily duties were supposed to be covered when Mr. Budram was not in the office, and they had been for over a year before the abrupt stoppage.

34. Defendant Gill continued to request Plaintiff Budram to take this shortcut. She was adamant that "we need to break some rules to catch up" after the ERP migration. While Whitener claimed to agree with Budram's refusal and told him he would "back him up", it was clear Gill was becoming even more unhappy with him after his refusals to participate in the unethical practice.

35. Defendant Gill also changed the permissions Budram had with the bank without telling him, which he relayed to Whitener. Whitener responded that it was "bizarre and wrong" for Gill to do this but did nothing about it.

36. In November, another crisis arose in the Treasurer's Department that required an outside auditor. Budram (and others) continued to work significant hours to keep the department functioning. He also continued to request a review from Whitener so that he could receive his long overdue raise– especially in light of all the extra hours since the Summer. When he asked HR to intervene, they claimed they couldn't help him. Despite the crisis going on in the Treasurer's office, both Defendants Gill and Whitener were absent the second half of December. Budram and other office employees were unable to take much time off during the holidays because of this.

37. In January of 2023, Plaintiff Budram was able to take time off that he couldn't take off during the holidays and used banked leave to take January 3-6 off. He returned to work Monday January 9 and spent most of the day on the back log of mail and inputting receipts that had not gotten done in his absence. Budram spoke with Whitener that day about an upcoming training he was interested in and

Whitener agreed it could work and they could talk about it soon.  It was an otherwise unremarkable workday.

38. On January 10, Plaintiff Budram had an IA attack in the middle of the night and had to immediately head to the emergency room.  He notified Defendants Gill and Whitener at 4:56 am about the attack.   Later that day he sent them the doctor's note that required him to stay off work until Friday, January 13, due to a complication that occurred during the incident.

39. Plaintiff returned to the office on Friday, January 13.  He was abruptly terminated in a meeting with Defendants Gill and Whitener who stated that it was because there were many complaints about Budram and that they "could not have this in the office anymore".

40. Plaintiff asked what complaints they were talking about as no complaints had been brought to his attention.  Mr. Whitener did not have specifics as to who complained or what they complained about, just that "legal counsel" informed him of this.

41. Mr. Budram had never been talked to or reprimanded about his work performance or relationships; no complaint had ever been brought to his attention previously, and his personnel file contained no indication of anything but a satisfactory work record.

42. Plaintiff has suffered economic and compensatory loss due to the wrongful termination as well as other damages.

## COUNT I

## VIOLATION OF FMLA – FMLA INTERFERENCE

43. Plaintiff incorporates by reference paragraphs 1- 42 as though fully stated herein.

44. Plaintiff was an employee as defined in Section 101(3) of FMLA, 29 USC §2611(3).

45. Defendants were employers as defined in Section 101(3) of FMLA, 29 USC §2611(3), and are required to comply with the FMLA.

46. Plaintiff was, at all times relevant, an "eligible employee" within the meaning of Section 101(2)(A) of FMLA, 29 USC §2611(2)(A).

47. Defendant County has a policy of progressive discipline, which involves verbal warnings, first written warnings, second written warnings, and final written warnings/termination.

48. Despite their policy and practice, Defendants did not employ progressive discipline with respect to Plaintiff and instead fired him without reason.

49. The temporal proximity of Plaintiff's medical leave and his termination, along with Defendants' pretextual reason for his termination and failure to follow its own progressive discipline policy (even if they did believe some form of misconduct occurred) establishes that Defendants' motivation in firing Plaintiff was at least in part to interfere with his ability to take additional FMLA leave and to discriminate against him for having requested FMLA leave.

50. Defendants also discriminated against Plaintiff for his condition by refusing to follow protocol regarding Covid exposure despite the risks the exposure carries for someone with an autoimmune issue.

51. Defendants violated 29 USC §2615(a)(1) and 29 USC § 2615(a)(2) when they treated him poorly after events surrounding his health condition issues and discharged Plaintiff and interfered with his FMLA rights as aforesaid.

52. As a result of Defendants' actions in violation of FMLA, Plaintiff is entitled to damages for lost salary and other employment benefits (Section 107(a)(1)(A)(i)(I) of FMLA, 29 USC §2617(a((1)(A)(i)(I)), interest thereon (Section 107(a)(1)(A)(ii) of FMLA, 29 USC §2617(a)(1)(A)(ii)), liquidated damages in an amount equal to the lost wages and employment benefits (Section 107(a)(1)(A)(iii) of FMLA, 29 USC §2617(a)(1)(A)(iii)), and fees and costs, including actual reasonable attorney's fees (Section 107(a)(3) of FMLA, 29 USC §2607(a)(3)).

## COUNT II

## FMLA – RETALIATION

53. Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

54. The temporal proximity of Plaintiff's most recent medical leave and his termination, along with Defendants' pretextual reason for his termination and failure to follow its own progressive discipline policy, establishes that Defendants' motivation in firing Plaintiff was at least in part in retaliation for his medical leave protected by the FMLA.

55.     Defendants also discriminated against Plaintiff for his condition by refusing to follow protocol in regard to Covid exposure despite the risks the exposure carries for someone with an autoimmune issue.

56.     Defendants violated 29 USC §2615(b) when they discharged Plaintiff in retaliation for his latest exercise of his FMLA rights to a medical leave.

57.     As a result of Defendants' actions in violation of FMLA, Plaintiff is entitled to damages for lost salary and other employment benefits (Section 107(a)(1)(A)(i)(I) of FMLA, 29 USC §2617(a((1)(A)(i)(I)), interest thereon (Section 107(a)(1)(A)(ii) of FMLA, 29 USC §2617(a)(1)(A)(ii)), liquidated damages in an amount equal to the lost wages and employment benefits (Section 107(a)(1)(A)(iii) of FMLA, 29 USC §2617(a)(1)(A)(iii)), and fees and costs, including actual reasonable attorney's fees (Section 107(a)(3) of FMLA, 29 USC §2607(a)(3)).

WHEREFORE, Plaintiff requests that the Court grant him the following relief for violations of his FMLA rights:

A. Reinstatement in the position from which he was discharged;

B. Damages equal to any salary, employment benefits and/or other compensation denied or lost to him by reason of violations of the FMLA by Defendants;

B. Award Plaintiff compensatory damages for mental anguish and emotional distress;

C. Interest on the amount requested in B above, calculated at the prevailing rate;

D. An additional amount as liquidated damages equal to the amount requested in B above, including interest thereon as requested in D above;

E. Reasonable attorney's fees, reasonable expert witness fees, if any, and other costs of this action; and

G. Such other and further relief as this Court deems just and proper.

## COUNT III

### Violations of PWDCRA

58. Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

59. Plaintiff's health condition of Idiopathic Angioedema (IA) was a disability under the Act and/or, he was regarded as having a disability.

60. Plaintiff seeks legal and equitable relief regarding deprivation of certain rights secured by Michigan's PWDCRA, MCL 37.1101 *et seq*.

61. Defendants discriminated against Plaintiff for his condition by refusing to follow protocol in regard to office Covid exposure -- despite the risks the exposure carries for someone with an autoimmune issue.

62. The adverse treatment of Plaintiff following the above health care discussion and incident, and temporal proximity of Plaintiff's termination after his most recent medical leave; along with Defendants' pretextual reason for his termination and failure to follow its own progressive discipline policy, establishes that Defendants' motivation in firing Plaintiff was at least in part because of his disability.

63. As a result of Plaintiff's discharge as aforesaid, he lost earnings and benefits and suffered mental anguish and emotional distress.

## Cause of Action

64. Defendants, by discriminating against and discharging Plaintiff, violated the PWDCRA in that they discriminated against Plaintiff because of a disability or perceived disability.

## Relief

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A. An order reinstating Plaintiff in an appropriate position;

B. An award to Plaintiff for back pay and lost benefits;

C. An award to Plaintiff for compensatory damages;

D. An award to Plaintiff for exemplary damages;

E. Plaintiff's costs and interest herein and reasonable attorney's fees; and

F. Such other legal and equitable relief as may be appropriate.

Dated: June 14, 2023	PINSKY SMITH, PC
	Attorneys for Plaintiff

	By /s/ *Katherine Smith Kennedy*
	Katherine Smith Kennedy
	Business Address:
	146 Monroe Center, N.W., Suite 418
	Grand Rapids, MI 49503

## JURY DEMAND

NOW COMES Plaintiff, by and through his attorneys, Pinsky Smith, PC and hereby demands a trial by jury of the entitled matter.

>PINSKY SMITH, PC
>Attorneys for Plaintiff

Dated: June 14, 2023        By **/s/ Katherine Smith Kennedy**
>Katherine Smith Kennedy (P-54881)
>146 Monroe Center St NW, Suite 418
>Grand Rapids, MI 49503
>(616) 451-8496